**Munley Law PC**
**227 Penn Avenue**
**Scranton, PA  18503**
**570-346-7401**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENNIS G. MERCURIO and | : | CIVIL ACTION - LAW |
| COLLEEN A. MERCURIO | : | |
| Plaintiffs | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | |
| LOUISVILLE LADDER, INC. | : | |
| Defendant | : | No. 3:16-CV-00412-RDM |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

NOW comes Plaintiffs, Dennis G. Mercurio and Colleen A. Mercurio, by and through their undersigned counsel, Munley Law, P.C. and files the within Response to Defendant's Statement of Facts.

1.    Admitted.

2.    Admitted.

3.    Admitted in part; denied in part.  It is admitted only to the extent that the Complaint speaks for itself.  However, it is specifically denied that the corresponding paragraph sets forth all of the material allegations contained within Plaintiff's Complaint.

4.    Admitted in part; denied in part.  It is admitted only to the extent that the Complaint speaks for itself.  However, it is specifically denied that the

corresponding paragraph sets forth all of the material allegations contained within Plaintiff's Complaint.

5.    Admitted in part; denied in part.  It is admitted only to the extent that the Complaint speaks for itself.  However, it is specifically denied that the corresponding paragraph sets forth all of the material allegations contained within Plaintiff's Complaint.

6.    Admitted.

7.    Admitted.

8.    Admitted in part; denied in part.  It is admitted only that the subject ladder is a Type IA, model FS 1508 stepladder with a duty rating of 300 pounds.  It is further admitted that the subject ladder complied with ANSI A14.5-2007.  However, it is specifically denied that compliance with ANSI A14.5-2007 is dispositive of the issues presented in this action.  To the contrary, it has long been the law of Pennsylvania that industry standards, such as the ANSI standards, are inadmissible in product liability cases.  Specifically, the Pennsylvania Supreme Court held that such evidence should be excluded because it tends to mislead the jury's attention from their proper inquiry,' namely 'the quality or design of the product in question.  Lewis v. Coffing Hoist Division, Duff-Norton Company, Inc., 515 Pa. 334, 528 A.2d 590, 594 (Pa. 1987)).  Tincher does not, nor does it purport to, affect the applicability of the rulings in Gaudio and Lewis.  Cancelleri v. Ford

<u>Motor Co.</u>, 136 A.3d 1027 (Pa. Super. Ct. 2016).  Additionally, Plaintiff's expert Mr. Fournier testified that the ANSI standards, specifically, ANSI A14.5-2007 is a minimum standard.  <u>Fournier Deposition</u>, Exh. C, at 83.  Mr. Fournier explains that "[t]here are limits and numbers in certain aspects of the design verification testing that, by their own admission, do not have a rational basis, but they're numbers that they agreed to in the interest of time and other things."  <u>Id.</u>  Mr. Fournier testified that the current racking test authorized by the ANSI standards allows for excessive flexibility.  <u>Id.</u> at 170-71.  Mr. Fournier explains that the current racking test permits 14 or 15 inches for an eight foot ladder.  <u>Id.</u> at 171.  Mr. Fournier opines that that is excessive and that ladders with that amount of racking capability have a tendency to walk unintentionally.  <u>Id.</u> During Mr. Fournier's testing of the subject ladder he found that the Louisville Ladder had 12 and a half inches of racking compared to only 2.45 inches of racking in the modified ladder.  <u>Id.</u> at 172.

9.     Admitted.

10.     Denied as stated.  Mr. Fournier explains that "[t]here are limits and numbers in certain aspects of the design verification testing that, by their own admission, do not have a rational basis, but they're numbers that they agreed to in the interest of time and other things."  <u>Id.</u>  Mr. Fournier testified that the current racking test authorized by the ANSI standards allows for excessive flexibility.  <u>Id.</u> at 170-71.  Mr. Fournier explains that the current racking test permits 14 or 15

inches for an eight foot ladder.  Id. at 171.  Mr. Fournier opines that that is excessive and that ladders with that amount of racking capability have a tendency to walk unintentionally. Id. During Mr. Fournier's testing of the subject ladder he found that the Louisville Ladder had 12 and a half inches of racking compared to only 2.45 inches of racking in the modified ladder.  Id. at 172.

11.    Admitted.

12.    Denied as stated.  The deposition testimony of Dennis Mercurio speaks for itself.  By way of further response, Plaintiff testified that after the subject ladder was purchased by Price Brother it went onto the truck that Plaintiff usually operated.  See Deposition of Dennis Mercurio, attached hereto as Exhibit A, a 12.  Mr. Mercurio however was not the only individual who used the subject ladder.  Id.  Plaintiff testified that he used that truck about ninety-five percent of the time. Id. at 13-14.  Mr. Mercurio had no input into which ladder would be purchased by Price Brothers.  Id. at 14.  Mr. Mercurio also testified that he had no input as to the height of the subject ladder that Price Brother's purchased.  Id.

13.    Admitted. By way of further response, the deposition testimony of Dennis Mercurio speaks for itself.

14.    Admitted. By way of further response, the deposition testimony of Dennis Mercurio speaks for itself.

15.    Admitted. By way of further response, the deposition testimony of Dennis Mercurio speaks for itself.

16.    Admitted. By way of further response, the deposition testimony of Dennis Mercurio speaks for itself.

17.    Admitted. By way of further response, the deposition testimony of Dennis Mercurio speaks for itself.

18.    Denied as stated.  It is admitted only that Mr. Mercurio had used the ladder prior to the subject incident.  However, it is specifically denied that the prior use of the ladder in any way indicates that the subject ladder was not defectively designed.  To the contrary, Plaintiff's expert Mr. Fournier opines, based on testing performed on an exemplar ladder and a modified exemplar ladder that "a) the unmodified exemplar ladder moved into a 3-point position and did not tip until the ladder user reached the fourth step level; b) the modified ladder with the dual stiffener plates did not move in two of the tests and moved substantially less than the unmodified ladder; and c) the amount of racking permitted by the modified ladder was 82% of that sustained by the unmodified exemplar ladder." Fournier Report, Exh. B, at 12.  Mr. Fournier also opines that "The subject ladder's ability to move unintentionally during the mounting of the stepladder made it defective, unfit for ordinary use, and unreasonably dangerous in a manner that was a cause of Mr. Mercurio's fall and injuries. Id.  "The ladder industry, including but not limited to

Louisville Ladder, is        and was aware, prior to Mr. Mercurio's incident, that ladder/user instability was and is a major cause of ladder fall incidents. The ladder industry, including but not limited to Louisville Ladder Inc., is and was aware that that all four feet of a stepladder must remain in contact with the supporting surface to maintain stability. The ladder industry, including but not limited to Louisville Ladder, is and was aware that ladder movement can cause instability and can initiate a fall." Id.  "RFI exemplar stepladder testing confirmed that the subject Louisville stepladder would move into unstable positions and initiate a fall by the ladder user under normal and foreseeable activities." Id. "Mr. Mercurio's fall was caused when the stepladder moved into an unstable three-point of contact position. Climbing the stepladder  caused his center of gravity to move into a position where the ladder became unstable and moved unexpectedly, causing Mr. Mercurio to fall and be injured." Id. at13.  "Louisville Ladder knew that the stepladder/user instability issues presented by normal and foreseeable ladder climbing operations could cause dangerous conditions that could result in a ladder fall and that a fall from height could cause serious injury or death." Id.  "Louisville Ladder's failure to conduct any simulated use testing regarding ladder movement after did not comply with reasonable product safety practice, allowed dangerous and potentially dangerous equipment to remain in use, and prevented ladder users from being warned about the dangerous condition." Id.  "The ability of the subject Louisville

Ladder Group stepladder to move, without the knowledge of the ladder user, into

unstable       positions made the stepladder defective, unfit for intended use, and

unreasonably dangerous, and this defect was the cause of the stepladder tip over

and fall incident that injured Mr. Mercurio." Id.  "Adding stiffener connections to

the spreader assembly would stiffen the stepladder, would reduce or eliminate the

degree of danger posed by the current design due the potential for the stepladder to

move into unstable and dangerous three-point positions, would reduce the

probability that the ladder could shift into a dangerous position, would not

adversely affect the use of the ladder, and the small increase in cost would not

affect the marketability of the stepladder." Id.

19.    Denied as stated.  It is admitted only to the extent that the deposition

testimony of Dennis Mercurio speaks for itself.  However, it is specifically denied

that Mr. Mercurio's alleged familiarity with the subject ladder in any way indicates

that the subject ladder was not defectively designed.  To the contrary, Plaintiff's

expert expressly states that "The work activities performed by Mr. Mercurio were

reasonable, were foreseeable to Louisville Ladder, should have been able to be

performed safely, and should have been considered by Louisville Ladder in their

testing and design." Id. at 12.  "Mr. Mercurio's use of the subject stepladder

conformed to good and reasonable stepladder practice, did not constitute a misuse

of the stepladder, and was not a cause of his fall." Id. at 13. Additionally, Mr.

Mercurio testified that he always made sure the hinges or spreaders were pushed down when he set up a ladder to lock the spreader bar.  Mercurio Deposition, Exh. A, at 51.  Mr. Mercurio also always made sure that all four feet of the ladder were flat on the ground prior to using the subject ladder.  Id. He further testified that he always inspected the ladder to make sure it was safe to climb prior to using it.  Id. at 52.  Mr. Mercurio testified that there was no damage to the ladder or its spreaders prior to his use of the ladder on April 29, 2014.  Id. at 53.

20.    Admitted in part; denied in part.  It is admitted only that Mr. Mercurio testified that he has read the warning stickers on the side of the subject ladder.  Id. at 52-53.  However, Plaintiff's expert Mr. Fournier opines that the warnings and instructions provided by Louisville Ladder with the subject ladder were defective because they did not warn of the possibility of unintended walking to excessive flexibility.  Fournier Deposition, Exh. C, at 101.

21.    Admitted in part; denied in part.  It is admitted only to the extent that the deposition testimony of Dennis Mercurio speaks for itself. However, to the extent Defendants suggest that the subject ladder was not defectively designed such averments are specifically denied.  To the contrary, Plaintiff's expert Mr. Fournier opines, based on testing performed on an exemplar ladder and a modified exemplar ladder that "a) the unmodified exemplar ladder moved into a 3-point position and did not tip until the ladder user reached the fourth step level; b) the

modified ladder with the dual stiffener plates did not move in two of the tests and moved substantially less than the unmodified ladder; and c) the amount of racking permitted by the modified ladder was 82% of that sustained by the unmodified exemplar ladder." Fournier Report, Exh. B, at 12. Mr. Fournier also opines that "The subject ladder's ability to move unintentionally during the mounting of the stepladder made it defective, unfit for ordinary use, and unreasonably dangerous in a manner that was a cause of Mr. Mercurio's fall and injuries. Id. "The ladder industry, including but not limited to Louisville Ladder, is and was aware, prior to Mr. Mercurio's incident, that ladder/user instability was and is a major cause of ladder fall incidents. The ladder industry, including but not limited to Louisville Ladder Inc., is and was aware that that all four feet of a stepladder must remain in contact with the supporting surface to maintain stability. The ladder industry, including but not limited to Louisville Ladder, is and was aware that ladder movement can cause instability and can initiate a fall." Id. "RFI exemplar stepladder testing confirmed that the subject Louisville stepladder would move into unstable positions and initiate a fall by the ladder user under normal and foreseeable activities." Id. "Mr. Mercurio's fall was caused when the stepladder moved into an unstable three-point of contact position. Climbing the stepladder caused his center of gravity to move into a position where the ladder became unstable and moved unexpectedly, causing Mr. Mercurio to fall and be injured."

Id. at13.  "Louisville Ladder knew that the stepladder/user instability issues presented by normal and foreseeable ladder climbing operations could cause dangerous conditions that could result in a ladder fall and that a fall from height could cause serious injury or death." Id.  "Louisville Ladder's failure to conduct any simulated use testing regarding ladder movement after did not comply with reasonable product safety practice, allowed dangerous and potentially dangerous equipment to remain in use, and prevented ladder users from being warned about the dangerous condition."  Id.  "The ability of the subject Louisville Ladder Group stepladder to move, without the knowledge of the ladder user, into unstable positions made the stepladder defective, unfit for intended use, and unreasonably dangerous, and this defect was the cause of the stepladder tip over and fall incident that injured Mr. Mercurio."  Id.  "Adding stiffener connections to the spreader assembly would stiffen the stepladder, would reduce or eliminate the degree of danger posed by the current design due the potential for the stepladder to move into unstable and dangerous three-point positions, would reduce the probability that the ladder could shift into a dangerous position, would not adversely affect the use of the ladder, and the small increase in cost would not affect the marketability of the stepladder." Id.

22.     Admitted. By way of further response, the deposition testimony of Dennis Mercurio speaks for itself.

23.     Denied as stated.  The light Mr. Mercurio intended to remove and replace at the time of the incident was attached to the building.  <u>Mercurio Deposition</u>, Exh. A, at 56.  The ground below the light, where the ladder was, was a flat, level concrete platform located off the staircase to the door.  <u>Id.</u> at 56; 58. The platform provided "more than ample" room for the subject ladder. <u>Id.</u> at 57. Mr. Mercurio testified that the front feet of the ladder were approximately three feet from the end of the landing.  <u>Id.</u> at 60.

24.     Denied as stated.  The ground below the light, where the ladder was, was a flat, level concrete platform located off the staircase to the door.  <u>Id.</u> at 56; 58.    The platform provided "more than ample" room for the subject ladder. <u>Id.</u> at 57.  Mr. Mercurio testified that the front feet of the ladder were approximately three feet from the end of the landing.  <u>Id.</u> at 60.

25.     Denied as stated.  Mr. Mercurio set the ladder up in the rear of the building facing the light he was about to remove and replace.  <u>Id.</u> at 59. Mr. Mercurio placed the rear legs of the ladder as far back against the exterior of the building as possible.  <u>Id.</u> at 59-60.  Mr. Mercurio purposefully pushed the ladder back as far as it could go in an attempt to secure the ladder.  <u>Id.</u> at 60.  Mr. Mercurio always climbed in the middle of the ladder for stability.  <u>Id.</u> at 61.

26.     Denied as stated.  Mr. Mercurio set the ladder up in the rear of the building facing the light he was about to remove and replace.  <u>Id.</u> at 59. Mr.

Mercurio placed the rear legs of the ladder as far back against the exterior of the building as possible.  Id. at 59-60.  Mr. Mercurio purposefully pushed the ladder back as far as it could go in an attempt to secure the ladder.  Id. at 60.  Mr. Mercurio always climbed in the middle of the ladder for stability.  Id. at 61.

27.     Admitted. By way of further response, the deposition testimony of Dennis Mercurio speaks for itself.

28.     Denied.  It is specifically denied that Mr. Mercurio climbed the ladder only to the third step.  At the time of the subject incident, Mr. Mercurio was in the process of removing and replacing an exterior light.  Id. at 61-62.  After positioning the ladder, Mr. Mercurio ascended the ladder and removed the existing light.  Id. at 62.  He manually unscrewed the four screws affixing the light to the building.  Id.  Mr. Mercurio testified that he climbed the ladder and was approximately chest height to the top of the ladder; the top cap of the ladder was approximately at the middle of his chest.  Id. at 63-64.  He testified that he was probably on the fourth step.  Id. at 64.  Mr. Mercurio then testified that he believes he may have been on the third step.  Id. at 64-65.  While Plaintiff acknowledges that Mr. Mercurio did offer some testimony that he may have been on the third step of the ladder at the time of the incident, a thorough reading of his deposition shows that he is not certain what step he was on at the time of the incident.  Mr. Mercurio testified that he knew he was about chest height to the top of the ladder.  When

asked what step he would have had to be on to be chest height to the ladder, Mr.

Mercurio was unsure and testified that it was the fourth step.  He then testified that

it may have been the third step. Mr. Mercurio testified as follows:

> Q.    Okay.  And while you were -- do you recall to get to where you needed to be height-wise to remove the old light what step you had to climb to?
>
> A.    Well, I know it was approximately chest height to the top of the ladder because the light was only probably six inches above the door.  So it was no reach.
> . . .
>
> Q.    And I think I understand what you were telling me.  But when you climbed the ladder, you climbed it so that the top cap of the ladder was at about middle of your chest?
>
> A.    Correct.
>
> Q.    Can you tell me how many steps you would have to climb to make that? Was it the fifth step or the fourth step from the bottom or -- can you tell us?
>
> A.    I would say probably the fourth step.
>
> Q.    Okay.  And we're going to count from the bottom, okay?
>
> A.    Un-huh.
>
> Q.    So one, two, three, fourth step, right where the spreaders -- right below where the spreaders attach?
>
> A.    One down, I would believe.
>
> Q.    One down?
>
> A.    Yeah.

> Q.   So you think it's actually the third step?
>
> A.   Probably so, yeah.  Actually if I had a shorter ladder, I would have been using that one.

<u>Mercurio Deposition</u>, Exh. A, at 64:12-65:9.Therefore, due to the conflicting statements, it is a question of fact to be determined by the jury regarding what step Mr. Mercurio was on at the time of the incident.

29.   Admitted. By way of further response, the deposition testimony of Dennis Mercurio speaks for itself.

30.   Admitted. By way of further response, the deposition testimony of Dennis Mercurio speaks for itself.

31.   Denied.  It is specifically denied that Mr. Mercurio climbed the ladder only to the third step.  To the contrary, when asked if he climbed the ladder back to the same step that he had before; Mr. Mercurio answered "Best of my Knowledge." <u>Id.</u> at 69.  While Plaintiff acknowledges that Mr. Mercurio did offer some testimony that he may have been on the third step of the ladder at the time of the incident, a thorough reading of his deposition shows that he is not certain what step he was on at the time of the incident.  Mr. Mercurio testified that he knew he was about chest height to the top of the ladder.  When asked what step he would have had to be on to be chest height to the ladder, Mr. Mercurio was unsure and testified that it was the fourth step.  He then testified that it may have been the third step.  Mr. Mercurio testified as follows:

Q.    Okay.  And while you were -- do you recall to get to where you needed to be height-wise to remove the old light what step you had to climb to?

A.    Well, I know it was approximately chest height to the top of the ladder because the light was only probably six inches above the door.  So it was no reach.
      . . .

Q.    And I think I understand what you were telling me.  But when you climbed the ladder, you climbed it so that the top cap of the ladder was at about middle of your chest?

A.    Correct.

Q.    Can you tell me how many steps you would have to climb to make that? Was it the fifth step or the fourth step from the bottom or -- can you tell us?

A.    I would say probably the fourth step.

Q.    Okay.  And we're going to count from the bottom, okay?

A.    Un-huh.

Q.    So one, two, three, fourth step, right where the spreaders -- right below where the spreaders attach?

A.    One down, I would believe.

Q.    One down?

A.    Yeah.

Q.    So you think it's actually the third step?

A.    Probably so, yeah.  Actually if I had a shorter ladder, I would have been using that one.

Id. at 64:12-65:9.Therefore, due to the conflicting statements, it is a question of fact to be determined by the jury regarding what step Mr. Mercurio was on at the time of the incident.

32.      Admitted in part; denied in part.  It is admitted only to the extent that the deposition testimony of Dennis Mercurio speaks for itself.  However, it is specifically denied that the prior use of the ladder in any way indicates that the subject ladder was not defectively designed.  To the contrary, Plaintiff's expert Mr. Fournier opines, based on testing performed on an exemplar ladder and a modified exemplar ladder that "a) the unmodified exemplar ladder moved into a 3-point position and did not tip until the ladder user reached the fourth step level; b) the modified ladder with the dual stiffener plates did not move in two of the tests and moved substantially less than the unmodified ladder; and c) the amount of racking permitted by the modified ladder was 82% of that sustained by the unmodified exemplar ladder." Fournier Report, Exh. B, at 12.  Mr. Fournier also opines that "The subject ladder's ability to move unintentionally during the mounting of the stepladder made it defective, unfit for ordinary use, and unreasonably dangerous in a manner that was a cause of Mr. Mercurio's fall and injuries. Id.  "The ladder industry, including but not limited to Louisville Ladder, is and was aware, prior to Mr. Mercurio's incident, that ladder/user instability was and is a major cause of ladder fall incidents. The ladder industry, including but not limited to Louisville

Ladder Inc., is and was aware that that all four feet of a stepladder must remain in

contact with the supporting surface to maintain stability. The ladder industry,

including but not limited to Louisville Ladder, is and was aware that ladder

movement can cause instability and can initiate a fall." <u>Id.</u> "RFI exemplar

stepladder testing confirmed that the subject Louisville stepladder would move into

unstable positions and initiate a fall by the ladder user under normal and

foreseeable activities." <u>Id.</u> "Mr. Mercurio's fall was caused when the stepladder

moved into an unstable three-point of contact position. Climbing the stepladder

caused his center of gravity to move into a position where the ladder became

unstable and moved unexpectedly, causing Mr. Mercurio to fall and be injured."

<u>Id.</u> at13.  "Louisville Ladder knew that the stepladder/user instability issues

presented by normal and foreseeable ladder climbing operations could cause

dangerous conditions that could result in a ladder fall and that a fall from height

could cause serious injury or death." <u>Id.</u> "Louisville Ladder's failure to conduct

any simulated use testing regarding ladder movement after did not comply with

reasonable product safety practice, allowed dangerous and potentially dangerous

equipment to remain in use, and prevented ladder users from being warned about

the dangerous condition." <u>Id.</u> "The ability of the subject Louisville Ladder Group

stepladder to move, without the knowledge of the ladder user, into unstable

positions made the stepladder defective, unfit for intended use, and unreasonably

dangerous, and this defect was the cause of the stepladder tip over and fall incident that injured Mr. Mercurio." Id. "Adding stiffener connections to the spreader assembly would stiffen the stepladder, would reduce or eliminate the degree of danger posed by the current design due the potential for the stepladder to move into unstable and dangerous three-point positions, would reduce the probability that the ladder could shift into a dangerous position, would not adversely affect the use of the ladder, and the small increase in cost would not affect the marketability of the stepladder." Id.

33.    Denied. It is specifically denied that Mr. Mercurio climbed the ladder only to the third step.   While Plaintiff acknowledges that Mr. Mercurio did offer some testimony that he may have been on the third step of the ladder at the time of the incident, a thorough reading of his deposition shows that he is not certain what step he was on at the time of the incident.  Mr. Mercurio testified that he knew he was about chest height to the top of the ladder.  When asked what step he would have had to be on to be chest height to the ladder, Mr. Mercurio was unsure and testified that it was the fourth step.  He then testified that it may have been the third step. Mr. Mercurio testified as follows:

> Q.    Okay.  And while you were -- do you recall to get to where you needed to be height-wise to remove the old light what step you had to climb to?

A.    Well, I know it was approximately chest height to the top of the ladder because the light was only probably six inches above the door.  So it was no reach.

. . .

Q.    And I think I understand what you were telling me.  But when you climbed the ladder, you climbed it so that the top cap of the ladder was at about middle of your chest?

A.    Correct.

Q.    Can you tell me how many steps you would have to climb to make that? Was it the fifth step or the fourth step from the bottom or -- can you tell us?

A.    I would say probably the fourth step.

Q.    Okay.  And we're going to count from the bottom, okay?

A.    Un-huh.

Q.    So one, two, three, fourth step, right where the spreaders -- right below where the spreaders attach?

A.    One down, I would believe.

Q.    One down?

A.    Yeah.

Q.    So you think it's actually the third step?

A.    Probably so, yeah.  Actually if I had a shorter ladder, I would have been using that one.

Id. at 64:12-65:9.Therefore, due to the conflicting statements, it is a question of fact to be determined by the jury regarding what step Mr. Mercurio was on at the time of the incident.

34.     Denied.  It is specifically denied that Mr. Mercurio climbed the ladder only to the third step.  While Plaintiff acknowledges that Mr. Mercurio did offer some testimony that he may have been on the third step of the ladder at the time of the incident, a thorough reading of his deposition shows that he is not certain what step he was on at the time of the incident.  Mr. Mercurio testified that he knew he was about chest height to the top of the ladder.  When asked what step he would have had to be on to be chest height to the ladder, Mr. Mercurio was unsure and testified that it was the fourth step.  He then testified that it may have been the third step. Mr. Mercurio testified as follows:

> Q.     Okay.  And while you were -- do you recall to get to where you needed to be height-wise to remove the old light what step you had to climb to?
>
> A.     Well, I know it was approximately chest height to the top of the ladder because the light was only probably six inches above the door.  So it was no reach.
>        . . .
>
> Q.     And I think I understand what you were telling me.  But when you climbed the ladder, you climbed it so that the top cap of the ladder was at about middle of your chest?
>
> A.     Correct.
>
> Q.     Can you tell me how many steps you would have to climb to make that? Was it the fifth step or the fourth step from the bottom or -- can you tell us?
>
> A.     I would say probably the fourth step.
>
> Q.     Okay.  And we're going to count from the bottom, okay?

A.      Un-huh.

Q.      So one, two, three, fourth step, right where the spreaders -- right below where the spreaders attach?

A.      One down, I would believe.

Q.      One down?

A.      Yeah.

Q.      So you think it's actually the third step?

A.      Probably so, yeah.  Actually if I had a shorter ladder, I would have been using that one.

Id. at 64:12-65:9. Therefore, due to the conflicting statements, it is a question of fact to be determined by the jury regarding what step Mr. Mercurio was on at the time of the incident.

35.     Admitted. By way of further response, the deposition testimony of Dennis Mercurio speaks for itself.

36.     Admitted in part; denied in part. It is admitted only to the extent that the deposition testimony of Dennis Mercurio speaks for itself. However, as explained by Mr. Fournier, the damage to the subject ladder is consistent with the ladder user coming in contact with the front section of the ladder during the fall incident while the rear section was restrained or supported.  Fournier Report, Exh. B, at 12.  Mr. Fournier further concluded that part of Mr. Mercurio's body must have come in contact with the stepladder as he fell to the stair landing. The force of

Mr. Mercurio's body striking the stepladder resulted in the observed spreader damage and permanent racking to the stepladder.  Id.

37.     Admitted in part; denied in part.  Other than Mr. Mercurio, there were no other witnesses to this incident.

38.     Admitted.  By way of further response, the expert report of Mr. Fournier speaks for itself.

39.     No response is required as to the statements contained within the corresponding paragraph.

40.     Denied.  It is specifically denied that Mr. Fournier opines that anything Mr. Mercurio did caused the ladder to fail. To the contrary, Mr. Fournier opines that Mr. Mercurio's fall was caused when the stepladder moved into an unstable three-point of contact position. Climbing the stepladder caused his center of gravity to move into a position where the ladder became unstable and moved unexpectedly, causing Mr. Mercurio to fall and be injured." Id. at13.

41.     Admitted in part; denied in part.  It is admitted to the extent that the expert report of Stephen E. Fournier, P.E. speaks for itself.  However, it is specifically denied that the corresponding paragraph sets forth all of Mr. Fournier's opinions and conclusions contained within his report.

42.     Admitted in part; denied in part.  It is admitted to the extent that the expert report of Stephen E. Fournier, P.E. speaks for itself.  However, it is

specifically denied that the corresponding paragraph sets forth all of Mr. Fournier's opinions and conclusions contained within his report.

43.     Admitted in part; denied in part.  It is admitted to the extent that the expert report of Stephen E. Fournier, P.E. speaks for itself.  However, it is specifically denied that the corresponding paragraph sets forth all of Mr. Fournier's opinions and conclusions contained within his report.

44.     Admitted.  By way of further response the Supplemental report of Mr. Fournier speaks for itself.

45.     Admitted.

46.     Denied as stated.  Mr. Mercurio graduated from Northeastern University in 1971.  Fournier Deposition, Exh. C, at 42-43.   He received a Bachelors of Science degree in Civil Engineering.  Id. at 43.  Mr. Fournier is a professional engineer in Maine and registered as a professional engineer in Pennsylvania in approximately 1991.  Id. at 43-44.  Mr. Fournier is a civil engineer with over forty-five years of experience in the field.  See Fournier CV, Exh. G. He is a member of the American Society of Civil Engineers and the construction institute.  Id.  Mr. Fournier has participated in over 150 ladder  related cases investigating falls from extension ladders, stepladders, metal disappearing stairways, fixed ladders, job-built ladders, adjusters ladders, ships ladders, step stools, articulating ladders, and library ladders.  Id.  Mr. Fournier's ladder

experience also includes conducting safety audits at construction job sites for
compliance with OSHA and ANSI.  Id.   He has conducted special training
sessions for a general contractor on ladders and scaffolds.  Id.  Furthermore, Mr.
Fournier has been qualified 20 separate times in cases involving ladders, in eight
states and two federal jurisdictions.  Id.

47.    Admitted.

48.    Admitted.

49.    Admitted.

50.    Denied as stated.  Mr. Fournier has been qualified as an expert in
numerous courtrooms in the United States.  Fournier Deposition, Exh. C, at 50-51.
He has been qualified as an expert in civil engineering and other subsets of civil
engineering.  Id. at 51.

51.    Admitted in part; denied in part.  It is admitted only to the extent that
the deposition testimony of Mr. Fournier speaks for itself.  However, it is
specifically denied that the corresponding paragraph sets forth all relevant
experience and qualifications of Mr. Fournier.  For example, while Mr. Fournier
has not authored an article that has appeared in a scholarly journal or a peer-
reviewed journal related to the opinions he has offered in this case; Mr. Fournier
has offer similar opinion testimony regarding his alternative design in other ladder
defect cases by way of deposition.  Id. at 63-64.

52.    Admitted in part; denied in part.  It is admitted only to the extent that the deposition testimony of Mr. Fournier speaks for itself.  However, Mr. Fournier is a professional engineer in Maine and registered as a professional engineer in Pennsylvania in approximately 1991.  Id. at 43-44.  Mr. Fournier is a civil engineer with over forty-five years of experience in the field.  See Fournier CV, Exh. G. He is a member of the American Society of Civil Engineers and the construction institute.  Id.  Mr. Fournier has participated in over 150 ladder  related cases investigating falls from extension ladders, stepladders, metal disappearing stairways, fixed ladders, job-built ladders, adjusters ladders, ships ladders, step stools, articulating ladders, and library ladders.  Id.  Mr. Fournier's ladder experience also includes conducting safety audits at construction job sites for compliance with OSHA and ANSI.  Id.   He has conducted special training sessions for a general contractor on ladders and scaffolds.  Id.  Furthermore, Mr. Fournier has been qualified 20 separate times in cases involving ladders, in eight states and two federal jurisdictions.  Id.

53.    Denied as stated.  Mr. Fournier has offer similar opinion testimony regarding his alternative design in other ladder defect cases by way of deposition. Id. at 63-64.

54.    Denied. It is specifically denied that Mr. Fournier never designed a component for a portable ladder.  To the contrary, Mr. Fournier specifically

testified that he designed the stiffener plates which he opines would have prevented the subject incident had they been installed on the subject ladder.  <u>See</u> Fournier Deposition, Exh. C, at 80; <u>See</u> <u>also</u> Fournier Report, Exh. B.

55.     Denied as stated.  It is specifically denied that Mr. Fournier testified that he had never been retained as an expert witness by a ladder manufacturer.  To the contrary, Mr. Fournier was asked if he had ever been retained as an expert witness by a ladder manufacturer in a case in which it was alleged that a portable ladder was defective to which he responded "No. I worked on a case at one point in time where for the defense side, but I worked basically for the owner of the ladder on a premises."  <u>Fournier Deposition</u>, Exh. C, at 79-80.

56.     Admitted in part; denied in part.  It is admitted only that Mr. Fournier holds no patents.  However, to the extent Defendants suggest that Mr. Fournier is not qualified to offer an expert opinion in this action merely because he does not hold any patents, such averments are specifically denied.

57.     Admitted in part; denied in part.  It is admitted only that Mr. Fournier has never taught in the field of civil engineering.  However, to the extent Defendants suggest that Mr. Fournier is not qualified to offer an expert opinion in this action merely because he never taught in the field of civil engineering, such averments are specifically denied.

58.     Admitted in part; denied in part.  It is admitted only that Mr. Fournier has not designed a warning for a ladder.  However, to the extent Defendants suggest that Mr. Fournier is not qualified to offer an expert opinion in this action merely because he not designed a warning for a ladder, such averments are specifically denied.

59.     Denied as stated.  It is specifically denied that compliance with ANSI A14.5-2007 is dispositive of the issues presented in this action.  To the contrary, it has long been the law of Pennsylvania that industry standards, such as the ANSI standards, are inadmissible in product liability cases.  Specifically, the Pennsylvania Supreme Court held that such evidence should be excluded because it tends to mislead the jury's attention from their proper inquiry,' namely 'the quality or design of the product in question.  Lewis v. Coffing Hoist Division, Duff-Norton Company, Inc., 515 Pa. 334, 528 A.2d 590, 594 (Pa. 1987)).  Tincher does not, nor does it purport to, affect the applicability of the rulings in Gaudio and Lewis.  Cancelleri v. Ford Motor Co., 136 A.3d 1027 (Pa. Super. Ct. 2016).  Additionally, Plaintiff's expert Mr. Fournier testified that the ANSI standards, specifically, ANSI A14.5-2007 is a minimum standard.  Fournier Deposition, Exh. C, at 83.  Mr. Fournier explains that "[t]here are limits and numbers in certain aspects of the design verification testing that, by their own admission, do not have a rational basis, but they're numbers that they agreed to in the interest of time and

other things." <u>Id.</u>  Mr. Fournier testified that the current racking test authorized by

the ANSI standards allows for excessive flexibility.  <u>Id.</u> at 170-71.  Mr. Fournier

explains that the current racking test permits 14 or 15 inches for an eight foot

ladder.  <u>Id.</u> at 171.  Mr. Fournier opines that that is excessive and that ladders with

that amount of racking capability have a tendency to walk unintentionally. <u>Id.</u>

During Mr. Fournier's testing of the subject ladder he found that the Louisville

Ladder had 12 and a half inches of racking compared to only 2.45 inches of

racking in the modified ladder.  <u>Id.</u> at 172.

      60.    Admitted in part; denied in part.  It is admitted only that Mr. Fournier

did not conduct all thirteen design verification tests set forth by ANSI A14.5-2007.

However, it is specifically denied that compliance with ANSI A14.5-2007 is

dispositive of the issues presented in this action.  To the contrary, it has long been

the law of Pennsylvania that industry standards, such as the ANSI standards, are

inadmissible in product liability cases.  Specifically, the Pennsylvania Supreme

Court held that such evidence should be excluded because it tends to mislead the

jury's attention from their proper inquiry,' namely 'the quality or design of the

product in question.  <u>Lewis v. Coffing Hoist Division, Duff-Norton Company, Inc.,</u>

515 Pa. 334, 528 A.2d 590, 594 (Pa. 1987)).  <u>Tincher</u> does not, nor does it purport

to, affect the applicability of the rulings in <u>Gaudio</u> and <u>Lewis</u>. <u>Cancelleri v. Ford</u>

<u>Motor Co.</u>, 136 A.3d 1027 (Pa. Super. Ct. 2016).  Additionally, Plaintiff's expert

Mr. Fournier testified that the ANSI standards, specifically, ANSI A14.5-2007 is a minimum standard.  Fournier Deposition, Exh. C, at 83.  Mr. Fournier explains that "[t]here are limits and numbers in certain aspects of the design verification testing that, by their own admission, do not have a rational basis, but they're numbers that they agreed to in the interest of time and other things."  Id.  Mr. Fournier testified that the current racking test authorized by the ANSI standards allows for excessive flexibility.  Id. at 170-71.  Mr. Fournier explains that the current racking test permits 14 or 15 inches for an eight foot ladder.  Id. at 171.  Mr. Fournier opines that that is excessive and that ladders with that amount of racking capability have a tendency to walk unintentionally.  Id. During Mr. Fournier's testing of the subject ladder he found that the Louisville Ladder had 12 and a half inches of racking compared to only 2.45 inches of racking in the modified ladder.  Id. at 172.

61.    Denied as stated. It is specifically denied that compliance with ANSI A14.5-2007 is dispositive of the issues presented in this action.  To the contrary, it has long been the law of Pennsylvania that industry standards, such as the ANSI standards, are inadmissible in product liability cases.  Specifically, the Pennsylvania Supreme Court held that such evidence should be excluded because it tends to mislead the jury's attention from their proper inquiry,' namely 'the quality or design of the product in question.  Lewis v. Coffing Hoist Division, Duff-Norton Company, Inc., 515 Pa. 334, 528 A.2d 590, 594 (Pa. 1987)).  Tincher

does not, nor does it purport to, affect the applicability of the rulings in Gaudio and

Lewis. Cancelleri v. Ford Motor Co., 136 A.3d 1027 (Pa. Super. Ct. 2016).

Additionally, Plaintiff's expert Mr. Fournier testified that the ANSI standards,

specifically, ANSI A14.5-2007 is a minimum standard. Fournier Deposition, Exh.

C, at 83. Mr. Fournier explains that "[t]here are limits and numbers in certain

aspects of the design verification testing that, by their own admission, do not have

a rational basis, but they're numbers that they agreed to in the interest of time and

other things." Id. Mr. Fournier testified that the current racking test authorized by

the ANSI standards allows for excessive flexibility. Id. at 170-71. Mr. Fournier

explains that the current racking test permits 14 or 15 inches for an eight foot

ladder. Id. at 171. Mr. Fournier opines that that is excessive and that ladders with

that amount of racking capability have a tendency to walk unintentionally. Id.

During Mr. Fournier's testing of the subject ladder he found that the Louisville

Ladder had 12 and a half inches of racking compared to only 2.45 inches of

racking in the modified ladder. Id. at 172.

62.     Denied as stated. It is specifically denied that compliance with ANSI

A14.5-2007 and/or OSHA regulations is dispositive of the issues presented in this

action. To the contrary, it has long been the law of Pennsylvania that industry

standards, such as the ANSI standards and OSHA regulations, are inadmissible in

product liability cases. Specifically, the Pennsylvania Supreme Court held that

such evidence should be excluded because it tends to mislead the jury's attention

from their proper inquiry,' namely 'the quality or design of the product in question.

Lewis v. Coffing Hoist Division, Duff-Norton Company, Inc., 515 Pa. 334, 528

A.2d 590, 594 (Pa. 1987)).  Tincher does not, nor does it purport to, affect the

applicability of the rulings in Gaudio and Lewis. Cancelleri v. Ford Motor Co., 136

A.3d 1027 (Pa. Super. Ct. 2016).  Additionally, Plaintiff's expert Mr. Fournier

testified that the ANSI standards, specifically, ANSI A14.5-2007 is a minimum

standard.  Fournier Deposition, Exh. C, at 83.  Mr. Fournier explains that "[t]here

are limits and numbers in certain aspects of the design verification testing that, by

their own admission, do not have a rational basis, but they're numbers that they

agreed to in the interest of time and other things."  Id.  Mr. Fournier testified that

the current racking test authorized by the ANSI standards allows for excessive

flexibility.  Id. at 170-71.  Mr. Fournier explains that the current racking test

permits 14 or 15 inches for an eight foot ladder.  Id. at 171.  Mr. Fournier opines

that that is excessive and that ladders with that amount of racking capability have a

tendency to walk unintentionally.  Id. During Mr. Fournier's testing of the subject

ladder he found that the Louisville Ladder had 12 and a half inches of racking

compared to only 2.45 inches of racking in the modified ladder.  Id. at 172.

   63.   Denied as stated.  It is admitted only that Mr. Fournier did not conduct

an in-person examination of the subject ladder.  However, Mr. Fournier reviewed

one hundred and ten (110) colored photographs of the subject ladder and twenty-five (25) colored photographs of the scene of the incident. Fournier Report, Exh. B, at 2.

64.     Denied as stated. It is admitted only that Mr. Fournier did not view the scene of the incident in-person. However, Mr. Fournier reviewed one hundred and ten (110) colored photographs of the subject ladder and twenty-five (25) colored photographs of the scene of the incident. Fournier Report, Exh. B, at 2.

65.     Denied as stated. Mr. Fournier testified that under certain conditions the design of stepladders may permit excessive flexibility and can have the occurrence of unintended walking. Fournier Deposition, Exh. C, at 83-84. Mr. Fournier also states that the tests required by ANSI are minimum standards and it is necessary that manufacturers design and manufacture a stepladder that is safe under normal and foreseeable uses. The tests that were discussed above do not accurately reflect the forces and loading conditions imposed on a ladder under the conditions that Mr. Mercurio was imposing to the stepladder at the time of his fall. If the Louisville Ladder Group had performed simulated use tests that reasonably reflected typical stepladder user movement, they should have realized that this model stepladder can move unexpectedly, that the unexpected movement can cause the stepladder to move into unstable positions, and that unexpected movement of the ladder can initiate falls. Fournier Report, Exh. B, at 10. Mr. Fournier also

explains that "There is not a factor of safety built in for the racking test and things of that nature." Fournier Deposition, Exh. C, at 168.  He further explains that those are arbitrary limits. Id.  Citing to the Ladder Rationale, Mr. Fournier explains that "Not all material studied and evaluated was incorporated into the final approved editions of the ANSI A14-1981 or A14-1982 Portable Ladder Standards. The reasons include redundancy of certain tests, lack of reliability or consistency of test methods, insufficient data, insufficient research based on the existing state of the technology, compromises during the ANSI consensus process, time restraints and urgency to complete work at the request of CPSC." Id. at 169.  He further noted that "while the racking test is somewhat useful for quantifying the twisting stiffness of a stepladder, there is no record of any rational basis for the maximum allowable deflections specified in the ANSI standard." Id. at 170.

66.    Denied as stated.  It is specifically denied that Mr. Fournier has an obligation to report his alternative design or opinions with the ANSI A14.5 committee or the Consumer Product Safety Commission.  Furthermore, it is specifically denied that Mr. Fournier's alleged failure to report his opinions to such organizations somehow makes his opinions invalid in this action.

67.    Denied as stated.  Mr. Fournier testified that he has a Werner ladder at home which is similar to the design of the Louisville ladder at issue here. Fournier Deposition, Exh. C, at 85.  The ladder was purchased as an exemplar ladder in one

of the cases he worked on where it was alleged that the ladder was defective.  Id. at

86.  He uses this ladder a couple times a year and had never fallen from it.  Id. at

85-86.  Mr. Fournier testified that he has performed a number of investigations and

is aware of the tendencies of the ladder and thus acts accordingly.  Id. at 172.  He

testified that "having performed studies and having identified this theory of

liability, am much more aware of that condition and consequences."  Id.

68.     Admitted.  By way of further response, the deposition testimony of

Mr. Fournier speaks for itself.

69.     Admitted.  By way of further response, the deposition testimony of

Mr. Fournier speaks for itself.

70.     Admitted.  By way of further response, the deposition testimony of

Mr. Fournier speaks for itself.

71.     Denied as stated. Mr. Fournier testified that there were verbal

protocols for testing.  Id. at 16.  Furthermore, Mr. Fournier testified that the

racking tests were conducted pursuant to the ANSI protocols.  Id. at 150.  He

further stated that the torsional resistance test was conducted pursuant to ANSI

protocols with the small exception of the use of plywood rather than a tile surface.

Id.

72.     Admitted in part; denied in part.  It is admitted only to the extent that

the deposition testimony of Mr. Fournier speaks for itself.  However, it is

specifically denied that the corresponding paragraph sets forth all relevant experience and qualifications of Mr. Fournier.  For example, while Mr. Fournier has not authored an article that has appeared in a scholarly journal or a peer-reviewed journal related to the opinions he has offered in this case; Mr. Fournier has offer similar opinion testimony regarding his alternative design in other ladder defect cases by way of deposition.  <u>Id.</u> at 63-64.

73.     Denied as stated.  It is specifically denied that the averments contained within the corresponding paragraph have any bearing on the issues presented in this action.  Furthermore, as this court is well aware experts may be precluded in other matters for a variety of reasons none of which have any bearing or relevance in this action.  Additionally, to the extent Defendants aver that Mr. Fournier is not qualified to offer the opinions contained within his Report, such averments are specifically denied.  To the contrary, Mr. Fournier is highly qualified to offer the opinions set forth in his report and deposition testimony.  Mr. Fournier is a civil engineer with over forty-five years of experience in the field.  <u>See</u> Fournier CV, Exh. G.   He is a member of the American Society of Civil Engineers and the construction institute.  <u>Id.</u>  Mr. Fournier has participated in over 150 ladder  related cases investigating falls from extension ladders, stepladders, metal disappearing stairways, fixed ladders, job-built ladders, adjusters ladders, ships ladders, step stools, articulating ladders, and library ladders.  <u>Id.</u>  Mr.

Fournier's ladder experience also includes conducting safety audits at construction job sites for compliance with OSHA and ANSI.  Id.   He has conducted special training sessions for a general contractor on ladders and scaffolds.  Id. Furthermore, Mr. Fournier has been qualified 20 separate times in cases involving ladders, in eight states and two federal jurisdictions.  Id.

74.    Defendants object to Mr. Fournier's opinions because he did not speak to Mr. Mercurio or Mr. Price, he never visited the scene of the incident and did not inspect the subject ladder.  However, these inquires are better suited for cross-examination and do not form a basis for preclusion of Mr. Fournier's testimony. Furthermore, while Mr. Fournier may not have directly spoken to Mr. Mercurio or Mr. Price he read their deposition testimony in this action.  Fournier Report, Exh. A, at 2.  Also, Mr. Fournier reviewed one hundred and ten (110) colored photographs of the subject ladder and twenty-five (25) colored photographs of the scene of the incident.  Id.  Defendant does not, nor can it, claim that these forms of information as well as the testing conducted at Mr. Fournier's direction are not commonly relied upon by civil engineers in formulating their opinions.  As such Defendant's Motion must be denied.

75.    Denied as stated.  All testing conducted on the exemplar ladder and the modified ladder was done at the direction of Mr. Fournier.  During the simulated testing the principal laboratory tester was instructed to mount and then

climb up to the third level and stop and then to the fourth step level and stop.

Fournier Deposition, Exh. C, at 6.  The results from the tests performed on the

unmodified exemplar ladder showed that

> In all five tests conducted, the rear ladder legs moved
> from 4-point contact to 3-point contact. In four out of the
> five times both legs moved horizontally, but one leg was
> able to contact the floor. In all five tests, the ladder did not
> move when he reached the 3rd step. In all five tests, the
> ladder did move when he reached the fourth step.

Fournier Report, Exh. A, at 6. At Mr. Fournier's direction the same testing was

conducted on the modified ladder which showed:

> In the first two tests, the ladder did not move and
> remained in contact with the floor at all times. In the last
> three tests, both rear feet moved. In the third test, the
> ladder remained in 4-point contact. In the fourth and fifth
> tests both rear feet moved but one of the feet remained in
> the air creating a 3-point contact. In the last two tests, the
> ladder did not move with the ladder user on the third
> step, but did move when the ladder user reached the
> fourth step.

Id.  The results of these tests were as follows: a) the unmodified exemplar ladder

moved into a 3-point position and did not tip until the ladder user reached the

fourth step level; b) the modified ladder with the dual stiffener plates did not move

in two of the tests and moved substantially less than the unmodified ladder; and c)

the amount of racking permitted by the modified ladder was 82% of that sustained

by the unmodified exemplar ladder.  Id.

76.     Denied as stated. While Mr. Fournier's report does not discuss the ladders defective warnings he testified during his deposition that the warnings and instructions provided by Louisville Ladder with the subject ladder were defective because they did not warn of the possibility of unintended walking to excessive flexibility. <u>Fournier Deposition</u>, Exh. C, at 101.

77.     Admitted.  By way of further response, the deposition testimony of Mr. Fournier speaks for itself.  By way of further response, Mr. Mercurio testified that he has read the warning stickers on the side of the subject ladder. <u>Mercurio Deposition</u>, Exh. A, at 52-53.  However, Plaintiff's expert Mr. Fournier opines that the warnings and instructions provided by Louisville Ladder with the subject ladder were defective because they did not warn of the possibility of unintended walking to excessive flexibility. <u>Fournier Deposition</u>, Exh. C, at 101.

78.     Denied as stated.  Mr. Fournier testified that he does not have a specific recollection of Mr. Mercurio reading the warnings on the subject ladder. However, Mr. Mercurio testified that he has read the warning stickers on the side of the subject ladder. <u>Mercurio Deposition</u>, Exh. A, at 52-53.

79.     Denied as stated.  Mr. Fournier was asked during his deposition "was the subject ladder inspected by someone at your direction to rule out a manufacturing defect in the ladder" to which he responded:"To the extent possible, yes." <u>Fournier Deposition</u>, Exh. C, at 108.  Mr. Fournier was then asked "And is it

your opinion, sir, that there was no manufacturing defect in the subject ladder?" to which he responded "I believe that to be the case, yes." Id. Mr. Fournier further testified that he discovered that the ladder had a design defect. Id.; see also Fournier Report, Exh. B.

80.    Denied.  The averments contained within the corresponding paragraph are vague and confusing thus precluding the Plaintiffs from either admitting or denying the same.  As such, said averments are denied.  It is only admitted that Mr. Fournier testified as to the events of April 29, 2014, which caused Mr. Mercurio's injuries.  By way of further response, the Deposition testimony of Mr. Fournier speaks for itself.

81.    Denied.  It is specifically denied that Mr. Fournier admitted in his deposition that Mr. Mercurio testified that the working level he reached on the ladder each of the three times he climbed it was the third step. To the contrary, Mr. Mercurio testified that he climbed the ladder and was approximately chest height to the top of the ladder; the top cap of the ladder was approximately at the middle of his chest.  Id. at 63-64.  He testified that he was probably on the fourth step.  Id. at 64.  Mr. Mercurio then testified that he believes he may have been on the third step.  Id. at 64-65.  While Plaintiff acknowledges that Mr. Mercurio did offer some testimony that he may have been on the third step of the ladder at the time of the incident, a thorough reading of his deposition shows that he is not certain what step

he was on at the time of the incident.  Mr. Mercurio testified that he knew he was

about chest height to the top of the ladder.  When asked what step he would have

had to be on to be chest height to the ladder, Mr. Mercurio was unsure and testified

that it was the fourth step.  He then testified that it may have been the third step.

Mr. Mercurio testified as follows:

> Q.   Okay.  And while you were -- do you recall to get to where you needed to be height-wise to remove the old light what step you had to climb to?
>
> A.   Well, I know it was approximately chest height to the top of the ladder because the light was only probably six inches above the door.  So it was no reach.
> . . .
>
> Q.   And I think I understand what you were telling me.  But when you climbed the ladder, you climbed it so that the top cap of the ladder was at about middle of your chest?
>
> A.   Correct.
>
> Q.   Can you tell me how many steps you would have to climb to make that? Was it the fifth step or the fourth step from the bottom or -- can you tell us?
>
> A.   I would say probably the fourth step.
>
> Q.   Okay.  And we're going to count from the bottom, okay?
>
> A.   Un-huh.
>
> Q.   So one, two, three, fourth step, right where the spreaders -- right below where the spreaders attach?
>
> A.   One down, I would believe.

Q.     One down?

A.     Yeah.

Q.     So you think it's actually the third step?

A.     Probably so, yeah.  Actually if I had a shorter ladder, I would have been using that one.

Mercurio Deposition, Exh. A, at 64:12-65:9.Therefore, due to the conflicting statements, it is a question of fact to be determined by the jury regarding what step Mr. Mercurio was on at the time of the incident.

82.     Denied as stated. Mr. Mercurio testified that he climbed the ladder and was approximately chest height to the top of the ladder; the top cap of the ladder was approximately at the middle of his chest.  Id. at 63-64.  He testified that he was probably on the fourth step.  Id. at 64.  Mr. Mercurio then testified that he believes he may have been on the third step.  Id. at 64-65.  While Plaintiff acknowledges that Mr. Mercurio did offer some testimony that he may have been on the third step of the ladder at the time of the incident, a thorough reading of his deposition shows that he is not certain what step he was on at the time of the incident.  Mr. Mercurio testified that he knew he was about chest height to the top of the ladder.  When asked what step he would have had to be on to be chest height to the ladder, Mr. Mercurio was unsure and testified that it was the fourth step.  He then testified that it may have been the third step. Mr. Mercurio testified as follows:

Q.    Okay.  And while you were -- do you recall to get to where you needed to be height-wise to remove the old light what step you had to climb to?

A.    Well, I know it was approximately chest height to the top of the ladder because the light was only probably six inches above the door.  So it was no reach.
. . .

Q.    And I think I understand what you were telling me.  But when you climbed the ladder, you climbed it so that the top cap of the ladder was at about middle of your chest?

A.    Correct.

Q.    Can you tell me how many steps you would have to climb to make that? Was it the fifth step or the fourth step from the bottom or -- can you tell us?

A.    I would say probably the fourth step.

Q.    Okay.  And we're going to count from the bottom, okay?

A.    Un-huh.

Q.    So one, two, three, fourth step, right where the spreaders -- right below where the spreaders attach?

A.    One down, I would believe.

Q.    One down?

A.    Yeah.

Q.    So you think it's actually the third step?

A.    Probably so, yeah.  Actually if I had a shorter ladder, I would have been using that one.

Mercurio Deposition, Exh. A, at 64:12-65:9.Therefore, due to the conflicting statements, it is a question of fact to be determined by the jury regarding what step Mr. Mercurio was on at the time of the incident.

83.     Denied as stated.  Mr. Fournier testified that he utilized the following methodology:

> My methodology in this case was basically to examine the act, positioning and act  of the ladder user in this case and then to attempt to duplicate, using an exemplar ladder, to look at whether or not the ladder would create unexpected movement that would lead to a three point of ladder contact -- ladder leg contact.  And once I determined that, then we went into the methodology of then conducting tests on the exemplar ladder with regard to torsional resistance and racking in compliance with the ANSI design verification tests. And then to do the same thing with the modified ladder.

Fournier Deposition, Exh. B, at 91.  During the simulated testing the principal laboratory tester was instructed to mount and then climb up to the third level and stop and then to the fourth step level and stop.   Id. at 6.  The results from the tests performed on the unmodified exemplar ladder showed that

> In all five tests conducted, the rear ladder legs moved from 4-point contact to 3-point contact. In four out of the five times both legs moved horizontally, but one leg was able to contact the floor. In all five tests, the ladder did not move when he reached the 3rd step. In all five tests, the ladder did move when he reached the fourth step.

Fournier Report, Exh. A, at 6. At Mr. Fournier's direction the same testing was conducted on the modified ladder which showed:

> In the first two tests, the ladder did not move and
> remained in contact with the floor at all times. In the last
> three tests, both rear feet moved. In the third test, the
> ladder remained in 4-point contact. In the fourth and fifth
> tests both rear feet moved but one of the feet remained in
> the air creating a 3-point contact. In the last two tests, the
> ladder did not move with the ladder user on the third
> step, but did move when the ladder user reached the
> fourth step.

Id.  The results of these tests were as follows: a) the unmodified exemplar ladder moved into a 3-point position and did not tip until the ladder user reached the fourth step level; b) the modified ladder with the dual stiffener plates did not move in two of the tests and moved substantially less than the unmodified ladder; and c) the amount of racking permitted by the modified ladder was 82% of that sustained by the unmodified exemplar ladder.  Id.  Based on Mr. Fournier's testing he concluded that had the modified design been implemented at the time of Mr. Mercurio's incident, the ladder would not have moved laterally and the subject incident would not have occurred.  Fournier Deposition, Exh. B, at 163.  Mr. Fournier explains that, if the modified ladder did move, the leg would go back down the same place and make four-point contact as opposed to move laterally in one direction or another as the unmodified version did.  Id.

84.    Denied. Mr. Fournier testified that the tests were conducted in accordance with the ANSI protocols with one small exception.  Id. at 150.  Mr. Fournier explained "I think the torsional resistance test was supposed to be done on

a tile surface, and we didn't have access to a tile surface. In the time constraints it was done on a plywood surface." Id.

85.    Admitted in part; denied in part.  It is admitted that Mr. Fournier did not have his alternative design tested on the torsional stability test.  However, Mr. Fournier did note that both the exemplar ladder and the modified later were tested with the racking test and the simulated test.  The results of these tests were as follows: a) the unmodified exemplar ladder moved into a 3-point position and did not tip until the ladder user reached the fourth step level; b) the modified ladder with the dual stiffener plates did not move in two of the tests and moved substantially less than the unmodified ladder; and c) the amount of racking permitted by the modified ladder was 82% of that sustained by the unmodified exemplar ladder.  Fournier Report, Exh. A, at 6.

86.    Denied as stated.  Mr. Fournier's opinions are based, *inter alia*, on two tests performed on the exemplar ladder and the modified later as well as his review of one hundred and ten (110) colored photographs of the subject ladder and twenty-five (25) colored photographs of the scene of the incident, the Deposition testimony of Dennis Mercurio, David Price and Thomas Schmitt.  Fournier Report, Exh. B, at 2.

87.    Denied as stated. Mr. Fournier testified that Mr. Mercurio has no recollection of the rear legs of the ladder rising off the ground, however, he also

testified that it's known and documented in the literature that most users are not aware of that kind of movement." <u>Fournier Deposition</u>, Exh. C, at 155.

88.     Denied.  Mr. Fournier testified as to the design of the plates as follows: "Basically, to get some **--** had some discussions with Mr. Johnson to see what he could do in the way of material available to be able to make bent plates. I wanted something that could ultimately be fabricated similar to a step or a platform. You know, the ultimate **--** ultimately that you could use to install on a **--** on the stepladder. The material we had available to us was basically a solid plate. It could be used, in my without having tested it, but in my opinion if we got material **--** the same material as the steps themselves were made out of and fabricated, that a same or similar result would occur." <u>Id.</u> at 155-56.  With respect to the shape of the plates, Mr. Fournier testified "The only analysis that was done was to make it C-shaped so that it could be either riveted to or fastened to the spreader bars." <u>Id.</u> at 156. Mr. Fournier testified that he would use a lighter material, probably a lighter gauge material for the plates . <u>Id.</u> These would be attached with rivets by drilling holes through the spreader arms for passage of rivets. <u>Id.</u> at 157.  Mr. Fournier testified that two rivets on each side for each plate would be necessary. <u>Id.</u>

89.     Admitted.  By way of further response, the deposition testimony of Mr. Fournier speaks for itself.

90.     Admitted in part; denied in part.  It is admitted only to the extent that the deposition testimony of Mr. Fournier speaks for itself. However, based on Mr. Fournier's testing, he concluded that had the modified design been implemented at the time of Mr. Mercurio's incident, the ladder would not have moved laterally and the subject incident would not have occurred.  Fournier Deposition, Exh. B, at 163. Mr. Fournier explains that, if the modified ladder did move, the leg would go back down the same place and make four-point contact as opposed to move laterally in one direction or another as the unmodified version did.  Id.

91.     Denied as stated.   Based on Mr. Fournier's testing he concluded that had the modified design been implemented at the time of Mr. Mercurio's incident, the ladder would not have moved laterally and the subject incident would not have occurred.  Fournier Deposition, Exh. B, at 163.  Mr. Fournier explains that, if the modified ladder did move, the leg would go back down the same place and make four-point contact as opposed to move laterally in one direction or another as the unmodified version did.  Id.

92.     Admitted in part; denied in part.  It is admitted only to the extent that the deposition testimony of Mr. Fournier speaks for itself. However, Plaintiff's expert Mr. Fournier testified that the ANSI standards, specifically, ANSI A14.5-2007 is a minimum standard.  Fournier Deposition, Exh. C, at 83.  Mr. Fournier explains that "[t]here are limits and numbers in certain aspects of the design

verification testing that, by their own admission, do not have a rational basis, but they're numbers that they agreed to in the interest of time and other things." Id. Mr. Fournier testified that the current racking test authorized by the ANSI standards allows for excessive flexibility. Id. at 170-71. Mr. Fournier explains that the current racking test permits 14 or 15 inches for an eight foot ladder. Id. at 171. Mr. Fournier opines that that is excessive and that ladders with that amount of racking capability have a tendency to walk unintentionally. Id. During Mr. Fournier's testing of the subject ladder he found that the Louisville Ladder had 12 and a half inches of racking compared to only 2.45 inches of racking in the modified ladder. Id. at 172.

93.     Denied as stated.  Mr. Fournier testified that if a ladder walks unintentionally it is likely defective.  Id. at 173.

94.     Denied as stated.  It is specifically denied that Mr. Fournier has an obligation to do "anything outside of litigation to advance his opinions." Furthermore, it is specifically denied that Mr. Fournier's alleged failure to report his opinions to any organizations somehow makes his opinions invalid in this action.

95.     No response is required as to the statements contained within the corresponding paragraph.  By way of further answer, Plaintiffs incorporate herein

by reference their Brief in Opposition to Defendants Motion in Limine, attached

hereto as Exhibit F.

**MUNLEY LAW, P.C.**

By: /s/ John M. Mulcahey
       John M. Mulcahey
       Supreme Court Id. No.: 74562
       Katie Nealon
       Supreme Court Id. No.: 317965
       Attorneys for Plaintiffs