IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
SCRANTON

PER

JUN - 1 2018

DEPUTY CLERK

DENNIS MERCURIO and COLLEEN     :
MERCURIO     :
    :
        Plaintiffs,     :
      v.     :     3:16-CV-412
    :     (JUDGE MARIANI)
LOUISVILLE LADDER, INC.     :
    :
        Defendant.     :

## MEMORANDUM OPINION

### I. INTRODUCTION

This is a products liability action arising from Plaintiff Dennis Mercurio's fall from a

stepladder designed and manufactured by Defendant Louisville Ladder, Inc. Mr. Mercurio

fell from the ladder while he was attempting to fix a light during the course of his

employment. Plaintiffs claim that Mr. Mercurio's injuries are due to the ladder's

manufacturing, design, and warning defects. Plaintiffs Mr. Mercurio and his wife, Colleen

Mercurio, brought five claims in state court: (1) strict liability, (2) negligence, (3) express

warranty, (4) implied warranty, and (5) loss of consortium. Doc. 18-1. On March 8, 2016,

Defendant removed the action to this Court on diversity grounds. Doc. 1. Subsequently,

Defendant filed a motion for summary judgment in conjunction with a motion in limine to

preclude Plaintiff expert Stephen Fournier. Docs. 17, 20. For reasons set forth below, the

motion in limine will be denied without prejudice subject to a *Daubert* hearing, and the

motion for summary judgment will be granted in part and denied in part.

1

## II. STATEMENT OF UNDISPUTED FACTS

Defendant has submitted a Statement of Material Facts as to which it submits there is no genuine issue or dispute for trial. Doc. 18. Plaintiffs submitted responses to the Statement of Material Facts. Doc. 27. The following facts are not reasonably in dispute except as noted.

On April 29, 2014, during his employment with Price Brothers Electrical Contractors, Mr. Mercurio fell off an 8 foot fiberglass stepladder while attempting to fix a light. Doc. 18 ¶ 3. The ladder was manufactured by Defendant and purchased by Mr. Mercurio's employer, Price Brothers, prior to the accident. *Id.* ¶ 7. The ladder is an A-frame ladder with a step attached every 12 inches along the rails. *Id.* ¶ 9. The non-climbing side has horizontal braces that connect between the side rails. *Id.* The ladder also has a mid-rail with "spreader braces on each side that allow the ladder to fold." *Id.* The ladder was intentionally designed with some flexibility (i.e. "racking") to ensure that all four feet of the ladder may be set up "on surfaces that are not completely flat or level." *Id.* ¶ 10.

On the day of the incident, Mr. Mercurio attempted to replace a light above the rear entrance to the Jackson Township Maintenance Building. *Id.* ¶ 17. Mr. Mercurio is familiar with the ladder at issue and has read its warnings and instructions, having used it on prior occasions. *Id.* ¶¶ 19-20.[1] Mr. Mercurio set up the rear of the ladder against the building,

---

[1] Although Plaintiff denied paragraph 19 by indicating "denied as stated," Plaintiffs' explanation does not in any way deny the truth of the statement, but rather, argues that the issue is legally irrelevant and not dispositive. In fact, a significant portion of Plaintiffs' counter-statement of facts are similarly "denied

and climbed on the front to unscrew the light on the building. *Id.* ¶ 28. He climbed back down the steps to take a light out of his truck to determine the drilling needed for the new light. *Id.* ¶ 29. He climbed the ladder a second time and placed the new light on the building, but descended again to retrieve a screw that he dropped. *Id.* ¶¶ 31-32. Mr. Mercurio then ascended the ladder for the third time, and as he was attempting to get the screwdriver from his pocket, he felt the ladder twist to the left under him, and tumbled down the steps with the ladder. *Id.* ¶¶ 33, 36. A key disputed issue in this case is whether Mr. Mercurio was on the third or fourth step of the ladder at the time of his fall. *See, e.g.,* ¶¶ 28, 31. Defendant's statement of facts claims that Mr. Mercurio testified at deposition that he was on the third step of the ladder when he fell. However, a review of the deposition transcript reveals that Mr. Mercurio did not recall with certainty which step on which he stood:

> Q. And I think I understand what you were telling me. But when you climbed the ladder, you climbed it so that the top cap of the ladder was at about middle of your chest?
>
> A. Correct.
>
> Q. Can you tell me how many steps you would have to climb to make that? Was it the fifth step or the fourth step from the bottom or – can you tell us?
>
> A. I would say probably the fourth step.
>
> Q. Okay. And we're going to count from the bottom, okay? [references a

---

as stated" responses, containing explanations that do not go to the truth of the matter, but rather, offers Plaintiffs' legal analysis of those assertions, or directs the Court to an unrelated fact. *See, e.g., id.* ¶¶ 10, 12, 18, 23-26, 46, 50, 53, 55, 59, 61-67, 71, 73, 75, 76, 78, 79, 82, 83, 86, 87, 91, 93, 94. Such "denied as stated" responses do not properly controvert the truth of the statement in accordance with Local Rule 56.1. Thus, to the extent these responses do not contradict the veracity of the statements of fact, the Court will deem such statements as admitted.

picture of the ladder.]

A. Un-huh.

Q. So one, two, three, fourth step, right where the spreaders – right below where the spreaders attach?

A. One down, I would believe.

Q. One down?

A. Yeah.

Q. So you think it's actually the third step?

A. Probably so, yeah. Actually if I had a shorter ladder, I would have been using that one.

Doc. 27-1 at 64-65. Thus, the record is unclear as to whether Mr. Mercurio was on the third or fourth step of the ladder—a significant issue of fact, since the only expert in this case[2], Mr. Stephen Fournier, found that during testing conducted on an exemplar ladder, "the ladder did not move when [the lab technician] reached the 3rd step... [but] the ladder *did* move when he reached the fourth step." Doc. 27-2 at 7 (emphasis added).

Fournier opined that the ladder suffered a design defect because it demonstrated an ability to move into "an unstable three-point of contact position" while a user is on the ladder, causing it to move unexpectedly. *Id.* at 12-13. This "ability to move unintentionally during the mounting of the stepladder made it defective, unfit for ordinary use, and unreasonably dangerous in a manner that was a cause of Mr. Mercurio's fall and injuries." *Id.* Fournier proposed an alternative design for the ladder by adding "stiffener connections to the spreader assembly" of the ladder, which would reduce "the potential for the

---

[2] Although the statement of facts references a defense expert in this case, Michael Van Bree, neither party has attached any evidence or testimony offered by Mr. Van Bree. The Court is therefore unable to assess Mr. Van Bree's opinions, if any, at this time.

stepladder to move into unstable and dangerous three-point positions." *Id.* at 13. In reaching these conclusions, Fournier conducted two types of ANSI [American National Standards Institute] design verification tests: a racking (i.e. flexibility) test and a torsional stability test. *Id.* at 5. Both tests on the subject ladder complied with ANSI standards. Fournier also performed a test he designed, called a "simulated use test," where he "attempted to duplicate, as closely as possible, a staged work activity where the ladder user activities could be viewed simultaneously with the position of the ladder feet." *Id.* The test was essentially comprised of Fournier's lab technician climbing onto an exemplar ladder five times in a simulated environment, and videotaping the ladder's movements. *Id.* at 6. During testing of the subject ladder, the ladder moved into three point contact in all five tests. *Id.* The technician then climbed on the ladder five more times with Fournier's proposed design modification. *Id.* The ladder moved into three-point contact in two of the five tests. *Id.* At deposition, Fournier testified that his "dynamic in-use" testing method did not have a written protocol, though he gave the technical verbal instructions. Doc. 18-10 at 16.

From observing the videotapes, Fournier concluded that "the amount of racking permitted by the modified ladder was 82% of that sustained by the unmodified exemplar ladder." Doc. 27-2 at 6. He further opined that had Defendant "performed certain simulated use tests, such as the testing [he] performed, [Defendant] would have known that the Ladder can achieve unsafe conditions and that these unsafe conditions can cause ladder

5

users to fall and be injured," though his only basis for this conclusion appears to be that he "had not been provided any evidence that [Defendant] conducts any testing above and beyond those called out in the ANSI standards." *Id.* at 11. Fournier opined that mere compliance with ANSI standards is insufficient, because they represent "minimum standards" and "do not accurately reflect the forces and loading conditions imposed on a ladder under the conditions that Mr. Mercurio was imposing to the stepladder at the time of his fall." *Id.* at 10.

Fournier's report does not contain any opinions on the manufacturing or warning label defects in the ladder. In his deposition, Fournier admitted that he did not find manufacturing defect in the ladder in his report:

> Q. Was the subject ladder inspected by someone at your direction to rule out a manufacturing defect in the ladder?
>
> A. To the extent possible, yes.
>
> Q. Okay. And is it your opinion, sir, that there was no manufacturing defect in the subject ladder?
>
> A. I believe that to be the case, yes.
>
> Q. Okay. And, in fact, in your report you talk about a design defect, but you do not discuss any manufacturing defects; correct?
>
> A. That's correct, um-hum.

Doc. 18-10 at 108. With respect to warning labels, Fournier admitted that his report does not contain any conclusions as to the adequacy of the ladder's warnings, but offered an *ad hoc* opinion during his deposition:

> Q. Do you have any criticism of the warnings and instructions provided on the subject Louisville ladder? And we've marked a copy of your report as an

exhibit if you need to refer to it...

A. I didn't. In my report I did not talk about warnings with regard to the unintentional movement issue. That perhaps could have been added in there, but—

Q. Well, do you have an opinion, to a reasonable degree of engineering certainty, that the warnings and instructions provided by Louisville Ladder for the subject ladder were defective?

A. No, the warnings and instructions on the ladder do not talk about unintentional movement or the consequences thereof.

Q. Is it your opinion that the warnings and instructions provided by Louisville Ladder with the subject ladder were defective?

A. *I guess [that's] my opinion now, yes.*

...

Q. And what is the exact terminology of the warnings that you propose should be added?

A. I haven't—I haven't studied that nor analyzed that. What I do know is that warnings that do go on products actually need to be designed and then tested on a–on a test audience to determine its effectiveness, *and I've not done that.*

*Id.* at 100-102 (emphasis added). Plaintiffs seek damages for Mr. Mercurio's "severe and permanent injuries" sustained as a result of the fall, including, among other things, a fractured right shoulder, shoulder joint and back pain, osteoarthritis, right shoulder degenerative joint disease, lumbar sprain and pain, and severe and permanent shock to his nerves. Doc. 18-1 ¶ 10. Plaintiffs also seek loss of consortium damages for Mr. Mercurio's wife, Colleen Mercurio. *Id.* ¶¶ 44-48. Plaintiffs first filed the suit against Defendant in a Pennsylvania Court of Common Pleas, which was then removed to this Court on March 8, 2016. Doc. 1. The complaint, which has remained the same since the case's initiation in state court, alleges five counts: (1) strict liability, (2) negligence, (3) express warranty, (4) implied warranty, and (5) loss of consortium. Doc. 18-1. On May 22, 2017, Defendant

simultaneously filed a motion for summary judgment and a motion in limine to preclude

Fournier as an expert. Docs. 17, 20. Defendant has also requested a *Daubert* hearing and

oral argument on its motion in limine. Doc. 20 at 18. Because much of Defendant's motion

for summary judgment hinges on the admissibility of Fournier's report and testimony, the

Court will address both motions in this memorandum opinion.

## II. STANDARDS OF REVIEW

In a motion for summary judgment, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,

...[o]nly disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-

moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct.

3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary

judgment simply on the basis of the pleadings, or on conclusory statements that a factual

issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by citing to particular parts of materials in the

record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

In a motion in limine, the court "rule[s] in advance of trial on the admissibility and

9

relevance of certain forecasted evidence." *United States v. Tartaglione*, 228 F. Supp. 3d 402, 406 (E.D. Pa. 2017). A court may exercise its discretion to rule in limine on evidentiary issues "in appropriate cases." *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 260 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Nevertheless, a "trial court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *Tartaglione*, 228 F. Supp. 3d at 406. "[I]n limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3, 120 S. Ct. 1851, 146 L. Ed. 2d 826 (2000).

Further, while motions in limine may serve as a useful pretrial tool that enables more in-depth briefing than would be available at trial, a court may defer ruling on such motions "if the context of trial would provide clarity." *Frintner v. TruePosition*, 892 F. Supp. 2d 699, 707 (E.D. Pa. 2012). Indeed, "motions in limine often present issues for which final decision is best reserved for a specific trial situation." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 518 n.10 (3d Cir. 1997). Thus, certain motions, "especially ones that encompass broad classes of evidence, should generally be deferred until trial to allow for the resolution of questions of foundation, relevancy, and potential prejudice in proper context." *Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013). Moreover, "*pretrial* Rule 403 exclusions should rarely be granted... [A] court cannot fairly ascertain the potential

10

relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990) (emphasis in original).

## III. ANALYSIS

### I. Defendant's Motion in Limine Will Be Denied Without Prejudice Subject to A *Daubert* Hearing

Because significant portions of Defendant's motion for summary judgment hinges on the outcome of the motion in limine, the Court will address the admissibility of Fournier's report and testimony first. Federal Rule of Evidence 702, which governs the admissibility of expert witnesses, provides that a witness may be qualified as an expert in a relevant filed if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 741-43 (3d Cir.1994)). "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to [Federal Rule of Evidence] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to

understand or determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

"By means of a so-called '*Daubert* hearing,' the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." *Schneider*, 320 F.3d at 404–05. The Third Circuit has "long stressed the importance of in limine hearings under Rule 104(a) in making the reliability determination required under Rule 702 and *Daubert*." *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir. 1999). "Whether to hold one rests in the sound discretion of the district court." *Id.* at 418. While a hearing is not required every time a *Daubert* objection is raised, "when the ruling on admissibility turns on factual issues…at least in the summary judgment context, failure to hold such a hearing may be an abuse of discretion." *Id.*

Here, Defendant has requested a *Daubert* hearing prior to a ruling on its motion in limine. Doc. 20 at 18. Defendant "does not contest the qualifications of Mr. Fournier" for purposes of Rule 702, but rather, argues that his methodology is unscientific and does not fit the facts of the case. Doc. 21 at 7 n. 6. First, Defendant argues that Fournier's test method "was not, in Mr. Fournier own words, 'repeatable' and therefore not scientific." Doc. 28 at 4. The usage of quotation marks around the word "repeatable" presumably suggests that Mr. Fournier had called his own test method not "repeatable." However, this assertion is not supported by any citation. In fact, Defendant's briefs as a whole do not contain any citations to either its statement of facts or to the record. The Court was therefore forced to

conduct its own review of the record. The word "repeatable" does not appear anywhere in Defendant's statement of facts, and only appears once in Mr. Fournier's deposition testimony, when Defendant's counsel asked him if industry test methods generally "have to be repeatable." Doc. 18-10 at 173. The Court will therefore discount this argument by the Defendant, and note that in future practice, counsel shall support their factual assertions in briefs with citations to the statement of facts or to the record. Second, Defendant takes issue with the fact that the dynamic in-use test devised by Fournier is "performed without a written protocol, wherein the technician climbed the ladder and moved on it to try to make one of the feet come off the ground." *Id.* at 9. However, the fact that there is no *written* protocol does not have significant impact on the soundness of Fournier's methodology, especially where, as here, Fournier testified that he gave his lab technician "verbal protocols." Doc. 18-10 at 16.

Nevertheless, Defendant's skepticism about the scientific rigor of Fournier's methodology is well taken. The limited sample size (five tests for each design) falls far short of that required for meaningful statistical significance in the testing results. *See, e.g., Moultrie v. Martin*, 690 F.2d 1078, 1083 (4th Cir. 1982) ("Population samples of less than 30 to 40 are generally considered to be small samples and require special treatment in certain statistical analyses"). The method of using a single lab technician is also questionable given that Fournier's report offers no comparison of size, weight, or other factors between the technician and Mr. Mercurio. In addition to the apparent issues in his report, Fournier's

deposition testimony also raises several potential areas for concern. For example, when asked if there were "any standards governing the investigation that [he] performed in this case and/or testing" conducted in this case, Fournier replied: "I'm not aware of them." Doc. 18-10 at 77. He also admitted that he did not personally participate in the testing conducted in this case, but instead, observed videotapes of the tests "after the fact." *Id.* at 34, 92. These videos did not capture the full picture of the ladder or the full height of the user. *Id.* at 160. When questioned about his proposed alternate design, Fournier conceded that the modification, as it was installed during his testing, could not be reproduced in mass production. *Id.* 152. Finally, Fournier testified that while he subjected Defendant's ladder to certain ANSI tests, which surpassed industry-set standards, he did not subject his "modified ladder design through the full spectrum of ANSI design verification tests." *Id.* at 158.

Nevertheless, the Court finds that these reservations are exactly the type of subject matter that should be probed further in a *Daubert* hearing. Though the parties do not mention it, the Court has independently found at least one federal case (a case that happened to involve the same Defendant) in which Fournier's "dynamic simulated use testing" was found to withstand Rule 702 scrutiny. *Riani v. Louisville Ladder, Inc.*, 2010 WL 2802040, at *9 (D. Mass. July 14, 2010). While it is not explicitly mentioned in the opinion, the case docket reveals that the court held a *Daubert* hearing before issuing its ruling on the admissibility of Fournier's opinions. *See Riani et al v. Louisville Ladder, Inc. et al*, Minutes for Proceedings, ECF No. 45, November 13, 2009, Docket No. 4:07-cv-40258. In *Riani*,

14

Fournier used a similar method where "each of [the] combinations [of designs] was tested five times." *Id.* at *8. The *Riani* court found the methodology to be sufficiently reliable to be admitted, noting that "[m]ethods similar to Fournier's dynamic testing have been used by researchers who have published in peer review journals." *Id.* at *9 (internal citations omitted). Furthermore, while the methodology "does not easily lend itself to a standardized or uniform test, give the variety of human movement," the court found several factors counseled towards admissibility, including the fact that "the jury can readily comprehend the nature of the test" given its simplicity; the fact that "the tests were recorded by video"; and the fact that "the opposing expert...did not take issue with the concept of dynamic testing, and [] performed a version of that testing himself." *Id.*

The reasoning in *Riani* suggests that the court there had the benefit of peer review articles, the ability to view the videotaped tests, and an opposing expert's analysis before ruling on the admissibility of Fournier's methodology. The Court finds that a *Daubert* hearing in this case, in which such evidence may be presented and Fournier may be subject to cross-examination, would aid the Court in determining the admissibility of Fournier's report and testimony. *See, e.g., State Farm Fire & Cas. Co. v. Steffen*, 2013 WL 12308502, at *3 (E.D. Pa. Mar. 14, 2013) ("The factual issues that exist here require a *Daubert* hearing to resolve them on a fully-developed record"). Accordingly, the motion in limine will be denied without prejudice. Defendant shall have the opportunity to renew its motion after the Court conducts a *Daubert* hearing.

II.     **Defendant's Motion for Summary Judgment Will Be Denied as to the Design Defect and Implied Warranty Claims.**

Much of Defendant's motion for summary judgment hinges on the admissibility of Fournier's report and testimony, thus precluding adjudication at this stage of the proceedings. For example, the implied warranty claim cannot be dismissed. To establish a breach of implied warranty, the plaintiff "must show that the equipment they purchased from defendant was defective." *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992). Defendant's entire argument as to this claim is that "[i]f this Court precludes the testimony of Mr. Fournier, there is no evidence of defect." Doc. 19 at 15. Thus, the implied warranty claim cannot be adjudicated without first determining the admissibility of Fournier's opinions.   Similarly, to the extent Plaintiffs' strict liability and negligence claims rests on design defect allegations, those claims cannot be resolved at this time. Defendant's argument there again presumes the preclusion of Fournier. *See, e.g.,* Doc. 19 at 12-13 ("If this Court grants defendant['s] motion to preclude Stephen Fournier, plaintiffs will be unable to establish that the Model FS 1508 ladder is defective and/or that any such defect caused Mr. Mercurio's accident and injuries. Further, plaintiffs will be unable to establish that Louisville Ladder was negligent"). Thus, Plaintiffs' claims based on design defect will not be dismissed.

The Court is constrained to briefly address a curious argument made by Plaintiffs in their opposition to the motion for summary judgment. Though Defendant's motion primarily draws on the flaws of Fournier's methodology, not on the fact that its ladder complied with

industry standards, Plaintiffs have raised the *sua sponte* argument that evidence of compliance with ANSI standards should not be contemplated. Doc. 26 at 10-11 (Plaintiffs' brief arguing that "[e]vidence of compliance with industry and government standards/regulations is irrelevant in a strict liability action and thus is inadmissible."). Plaintiffs claim that in Pennsylvania, evidence of industry standards "should be excluded because it tends to mislead the jury's attention from their proper inquiry, namely the quality or design of the product in question." Doc. 27 ¶ 8 (citing *Lewis v. Coffing Hoist Division, Duff-Norton Company, Inc.*, 528 A.2d 590, 594 (Pa. 1987)). Plaintiffs further argue that *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014), a recent seminal case from the Pennsylvania Supreme Court, "does not, nor does it purport to, affect the applicability of the ruling[] in...*Lewis*." The Court is unpersuaded by Plaintiffs' interpretation of *Tincher*. While the *Tincher* opinion did not explicitly overrule *Lewis*, it did overrule *Azzarello v. Black Brothers Co.*, 391 A.2d 1020 (Pa. 1978). And "[t]he *Lewis* majority's reasoning, based on *Azzarello* and the then-impermissible comingling of negligence and strict liability concepts, conflicts with *Tincher's* pronouncement that a manufacturer's conduct and reasonableness is relevant to the determination of product defect." *Rapchak v. Haldex Brake Prod. Corp.*, 2016 WL 3752908, at *3 (W.D. Pa. July 14, 2016) (internal citation omitted).

Furthermore, the *Tincher* Court emphasized that any questions of fact, including whether the elements of strict liability have been met and the concomitant factors that accompany the risk-utility calculus, should be reserved for the jury. *Tincher*, 104 A.3d at

407 ("The credibility of witnesses and testimony offered, the weight of evidence relevant to

the risk-utility calculus, and whether a party has met the burden to prove the elements of the

strict liability cause of action are issues for the finder of fact...A question of whether the

party has met its burden of proof is properly removed—for example, via adjudication of a

dispositive motion—from the jury's consideration only where it is clear that reasonable

minds [cannot] differ on the issue.") (internal quotation marks omitted). *See also Nathan v.

Techtronic Indus. N. Am., Inc.*, 92 F. Supp. 3d 264, 269 (M.D. Pa. 2015) (noting that *Tincher*

underscored the overarching principle that "whether a product is in a defective condition is a

question of fact to be decided by the jury.") (citing *Tincher*, 104 A.3d at 335).

"Accordingly, although evidence of compliance with industry standards is not a

complete defense to a plaintiff's strict liability claim, or even necessarily [] highly probative,...

without affirmative authority from *Tincher* or any other post-*Tincher* precedential decision [of

the Pennsylvania Supreme Court] barring such evidence ... the principles of *Tincher* counsel

in favor of its admissibility." *Rapchak,* 2016 WL 3752908, at *3 (internal quotation marks

omitted). *See also Cloud v. Electrolux Home Prod., Inc.*, 2017 WL 3835602, at *2 (E.D. Pa.

Jan. 26, 2017) (noting that "[a]fter *Tincher*, courts should not draw a bright line between

negligence theories and strict liability theories regarding evidence of industry standards.

This evidence of course is not dispositive, but it is relevant and probative given the *post hoc*

evaluation of a manufacturer's conduct that *Tincher* invites, even in strict liability cases").

In any event, Plaintiffs' *Tincher*-based arguments are beside the point, as Defendant does not base its arguments for dismissal on the fact that its ladder complied with ANSI standards. While Plaintiffs vigorously contend that evidence of industry standards must be precluded, all such evidence is proffered by Plaintiffs' own expert, Fournier. Defendant, for its part, has neither offered independent evidence of industry compliance nor relied on such evidence in its briefing. Thus, the Court declines to address Plaintiffs' arguments for the preclusion of industry compliance, but notes that should Defendant seek to introduce such evidence at trial, Plaintiffs may renew the argument as to whether such evidence should be precluded.

### III. Defendant's Motion for Summary Judgment Will Be Granted as to the Express Warranty, Manufacturing Defect, and Inadequate Warning Claims.

Notwithstanding the above, at least some of Plaintiffs' claims may be dismissed at this time. Defendant has argued for the dismissal of the express warranty claim because "[n]o express warranty was offered with the ladder, and Mr. Mercurio was not involved in the transaction." *Id.* at 14. To prevail on a claim for breach of warranty in Pennsylvania, "the Plaintiff must establish that a breach of warranty occurred and that the breach was the proximate cause of the specific damages sustained." *Yurcic v. Purdue Pharma, L.P.*, 343 F. Supp. 2d 386, 394 (M.D. Pa. 2004). "To show breach, there must have been an express warranty...and the warranty must have become part of the 'basis of the bargain.'" *Id.* Plaintiffs have not attempted to address or even mention the express warranty argument presented by Defendant. Furthermore, Plaintiffs affirmatively admitted that the ladder in

19

question was purchased by his employer, not him. Doc. 27 ¶ 7. In other words, there is no indication that Mr. Mercurio participated in the sales transaction in which Defendant's warranties were part of the "basis of the bargain." Accordingly, the express warranty claim will be dismissed.

Plaintiffs' manufacturing defect and inadequate warning claims require a more surgical analysis. While the complaint sounds in claims of design defect, manufacturing defect, and warning defect, Plaintiffs failed to separate these claims into discrete counts, opting instead to plead general "strict liability" and "negligence" for these allegations (Counts I and II of the complaint). Doc. 18-1. Despite Plaintiffs' imprecise pleading, the Court will address the manufacturing defect and inadequate warning claims separately from the design defect claim.

To the extent that the strict liability and negligence counts are premised on allegations of manufacturing defect, such a claim fails to overcome summary judgment. As with the express warranty claim, Plaintiffs wholly failed to address Defendant's argument that "neither of Mr. Fournier's reports state[s] any opinion that the ladder contained a manufacturing defect, and at his deposition he conceded there was no such defect." Doc. 19 at 12. Plaintiffs' failure to defend the claim is presumably due to the fact that Defendant's argument accurately summarizes the record. At deposition, Fournier testified that his lab inspected the ladder to "rule out a manufacturing defect in the ladder," that he

did not believe the ladder contained such a defect, and that he did not include any discussion of manufacturing defects in his reports:

> Q. Was the subject ladder inspected by someone at your direction to rule out a manufacturing defect in the ladder?
>
> A. To the extent possible, yes.
>
> Q. Okay. And is it your opinion, sir, that there was no manufacturing defect in the subject ladder?
>
> A. I believe that to be the case, yes.
>
> Q. Okay. And, in fact, in your report you talk about a design defect, but you do not discuss any manufacturing defects; correct?
>
> A. That's correct, um-hum.

Doc. 18-10 at 108. Defendant's statement of facts contained a paragraph stating that "Mr. Fournier admits there was no manufacturing defect in the subject ladder," citing to the page of his deposition testimony quoted above. Doc. 18 ¶ 79. Although Plaintiffs responded to this statement as "denied as stated," all Plaintiffs offered to controvert the statement was a citation to the *same page* of Fournier's deposition, and adding that Fournier "further testified that he discovered the ladder had a design defect." Doc. 27 ¶ 79. This "denial" leaves the Court at a loss as to what Plaintiffs are denying. The deposition testimony quoted above unequivocally shows Fournier conceding that he did not find a manufacturing defect. Furthermore, the fact that Fournier found a design defect is entirely unrelated to whether he found a manufacturing defect. This is yet another salient example of Plaintiffs' misuse of a counter statement of facts and refusal to respond to statements of fact with proper denials. As indicated by footnote 1 of this opinion, such "denials" will be

deemed as admissions.

As for the inadequate warning allegations, Defendant argues that while Fournier offered an opinion on the ladder's warnings in response to deposition questions, his prepared report "offered no criticism of the ladder warnings." Doc. 19 at 11. Plaintiffs point to the fact that Fournier offered an opinion on the warnings' adequacy at deposition, and argue that his deposition statements constitute evidence that Fournier "opine[d] that the warnings and instructions provided by Louisville Ladder with the subject ladder were defective." Doc. 26 at 11 (citing exclusively to Fournier's deposition testimony). However, the actual answers provided by Fournier at deposition are much more equivocal. He specifically testified that he "did not talk about warnings with regard to the unintentional movement issue" in his report. *Id.* at 100. When asked if he had formed any opinion as to the defectiveness of the warnings and instructions on the ladder, he merely stated "the warnings and instructions on the ladder do not talk about unintentional movement or the consequences thereof" without stating whether that constituted a defect in the warning. *Id.* at 101. After counsel pressed him by asking "[i]s it your opinion that the warnings and instructions provided by Louisville Ladder with the subject ladder were defective," he finally answered "I guess [that's] my opinion now, yes." *Id.*

Fournier's testimony reveals that he did not conduct any testing or analysis on the adequacy of the ladder's warnings in preparing his report. In fact, his answer "I guess [that's] my opinion now, yes" indicates that he formed an opinion on the subject *during* the

22

deposition that carried with it Fournier's admission of its speculative nature. Further, when counsel followed up with a question as to "the exact terminology of the warnings that [he] propose[s] should be added," Fournier responded: "I haven't—I haven't studied that nor analyzed that. What I do know is that warnings that do go on products actually need to be designed and then tested on a–on a test audience to determine its effectiveness, *and I've not done that*." *Id.* at 102 (emphasis added). Thus, Fournier indicated that he was aware of the proper testing methodology for warning labels, namely, that the proposed terminology should be given to "a test audience to determine [the warning's] effectiveness," yet he admitted he did not conduct such a test before proffering a haphazard "opinion" on the ladder's warnings at deposition. In sum, Fournier's spur-of-the-moment conclusion is not supported by any scientific analyses or testing.

Furthermore, the Court has uncovered at least one case holding that Fournier "is not qualified to render opinions regarding product warnings or bilingual instructions," which both parties have failed to mention in their briefing. *Medina v. Louisville Ladder, Inc.*, 496 F. Supp. 2d 1324 (M.D. Fla. 2007). In *Medina*, the court noted that in addition to his lack of experience for Spanish-language warnings, Fournier had "no material background in warnings related to consumer products in general, or ladders in particular." *Id.* at 1327. The court noted that "the subject of warnings is not even mentioned in Mr. Fournier's resume"; that he "has never written any articles on the subject of warnings, nor has he prepared an on-product warning or manual for any product which was sold commercially";

23

and that his "conclusions [with respect to the warnings at issue] were developed solely for this case, have not been peer-reviewed, and are not generally accepted." *Id.* at 1327-28. Similarly, in this case, there is no evidence from the record that Fournier had any background or experience in assessing products' warnings and instructions, and more importantly, no evidence that he even attempted to assess the ladder's warnings in this case. Therefore, to the extent that Plaintiffs' strict liability and negligence claims depend upon allegations of defective warnings, such claims will be dismissed.

## IV. CONCLUSION

For the reasons outlined above, Defendant's motion in limine to preclude Mr. Fournier (Doc. 20) will be denied without prejudice subject to a *Daubert* hearing. Defendant's motion for summary judgment (Doc. 17) will be granted as to Plaintiffs' express warranty, manufacturing defect and defective warning claims, but denied as to the rest of Plaintiffs' claims. A separate Order will follow.

Robert D. Mariani
United States District Judge